**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ROLE MODELS AMERICA, INC., et al.**

**Plaintiffs,**

**v.**

**PENMAR DEVELOPMENT CORP., et al.**

**Defendants.**

---

**Civil Action No.  04-130 (JDB)**

## MEMORANDUM OPINION

When plaintiffs set out to convert a former U.S. Army facility near the Maryland-Pennsylvania border into a model, military-style magnet school for at-risk youth, they ended up entrenched in a series of legal battles with both their landlord and the federal government. Having lost earlier contests, plaintiffs now seek to outflank the judgments of other courts by asserting in this action various constitutional, statutory, and common-law claims against the same parties.  In response, defendants ask this Court to preclude plaintiffs from pursuing these matters and to declare the claims barred by res judicata.  Defendants' point is well-taken.  As the Supreme Court has said, "[p]ublic policy dictates that there be an end to litigation; that those who have contested an issue shall be bound by the result of the contest; and that matters once tried shall be considered forever settled between the parties." Baldwin v. Iowa State Traveling Men's Ass'n, 283 U.S. 522, 525 (1931).  Accordingly, and for the reasons that follow, the Court will grant summary judgment to defendants on all the federal questions presented in this case and on two of the pendent state-law claims, and it will exercise its discretion to dismiss the remaining

supplemental claims on jurisdictional grounds.

## BACKGROUND

On August 7, 1998, Congress authorized funding for a "Role model academy project" as part of the Workforce Investment Act.  See Pub. L. No. 105-220, § 169(g), 112 Stat. 936, 1028-30 (1998) (codified at 29 U.S.C. § 2914(g) (2005)).  The Act designated the project to receive a grant from the Department of Labor ("DOL") and described the nascent academy as "a residential center located on the site of a [closed] military installation" that would provide "out-of-school youth" with "vocational training, secondary school course work ... [and] mentors who serve as role models."  Id.  Passage of the legislation was the culmination of several years of lobbying by plaintiff Robert Alexander, an African-American psychologist, criminologist, and former Army officer.  Am. Compl. ¶¶ 13 & 19.  Pursuant to this authorizing legislation and subsequent appropriations, DOL awarded a $10 million grant to a private entity created by Alexander -- Role Models America, Inc. (d/b/a National Role Models Academy - College Corps) -- to establish and operate the Role Models America Academy Demonstration Program.  Id.  Dr. Alexander and Role Models America, Inc. (hereinafter collectively referred to as "RMA") proceeded to identify a site for the academy that would satisfy the requirements of the grant and settled on the former Fort Ritchie property in Cascade, Maryland.

Fort Ritchie had been an active U.S. Army facility until 1995, when it was shuttered during a round of base closings.  Id.  In response to the base closure, the Maryland General Assembly created the PenMar Development Corp. ("PenMar") in 1997 to serve as the redevelopment authority for Fort Ritchie and to take possession of the former base from the Army, as authorized by the Defense Base Closure and Realignment Act of 1990 ("DBCRA"), 10

U.S.C. § 2687 (2005). PenMar/LaFleur Mem. Supp. Mot. to Dismiss at 2-3. On June 1, 1998, the Army leased the Fort Ritchie property to PenMar in anticipation of an eventual permanent transfer of ownership. Id. Dr. Alexander and PenMar's Executive Director, James LaFleur, executed a sublease agreement on March 10, 2000, between RMA and PenMar, whereby RMA would occupy several buildings on the Fort Ritchie property and pay annual rent of approximately $1.3 million. Pls.' Opp. to PenMar/LaFleur Mot. to Dismiss Ex. 4. The lease had an initial term of one year, and RMA held a renewal option for a subsequent four-year period and an additional five-year contingent renewal option. Id.

Shortly thereafter, the relationship between RMA and PenMar began to deteriorate. In February 2001, PenMar initiated what would become the first of several lawsuits involving the present parties, seeking an order from a Maryland state court that RMA remove two flagpoles it had installed on the property. Am. Compl. ¶ 44. A few months later, PenMar filed a series of landlord-tenant actions in Maryland to collect allegedly unpaid rent and utility charges. Id. at ¶¶ 45-46. On October 5, 2001, the District Court of Maryland for Washington County entered a judgment in favor of PenMar for possession of the property. PenMar/LaFleur Mot. to Dismiss Ex. 11. On appeal, the Circuit Court for Washington County affirmed the judgment, see PenMar/LaFleur Mot. to Dismiss Ex. 8, and the Court of Appeals of Maryland denied RMA's petition for a writ of certiorari on May 9, 2002, see PenMar/LaFleur Mot. to Dismiss Ex. 9. RMA then sought to forestall eviction by seeking review of the Circuit Court's decision in federal Bankruptcy Court. See In re Role Models of Am., Inc., No. 02-15752, (Bankr. D. Md. filed May 10, 2002). The Bankruptcy Court, however, declined to intervene, see PenMar/LaFleur Mot. to Dismiss Ex. 10, and RMA was evicted on July 12, 2002, see Am. Compl. ¶ 62.

While the PenMar-initiated eviction proceedings were ongoing, RMA commenced two suits of its own.  The first was filed in this Court, before Judge Ricardo Urbina, on July 24, 2001. It requested a temporary restraining order and a preliminary injunction against the Army to prevent the transfer of the Fort Ritchie property to PenMar, as well as an order compelling the Army to reconsider RMA's application for a public-benefit conveyance of the property, or, in the alternative, an order requiring the Army to convey the property directly to RMA at no cost.  See Role Models Am., Inc. v. White (hereinafter "Role Models I"), 193 F. Supp. 2d 76, 78 (D.D.C. 2002).  In that case, RMA alleged (1) that the Army failed to follow the procedures required by the Base Closure Act of 1994 and the Administrative Procedure Act when it negotiated a transfer of the Fort Ritchie property to PenMar, (2) that the Army failed to give proper notification of the availability of the surplus property to eligible parties, and (3) that the Army failed to properly screen applicants for a public-benefit conveyance.  Id. at 79.  On January 15, 2002, Judge Urbina denied RMA's request for preliminary injunctive relief.  Id. at 87.  The D.C. Circuit, however, reversed that decision on February 4, 2003, based on its conclusion that the Army had violated applicable statutory and regulatory notice requirements, and it remanded the case with instructions to enjoin a conveyance of the property to PenMar until the government remedied the procedural errors.  See Role Models Am., Inc. v. White (hereinafter "Role Models II"), 317 F.3d 327, 333-34 (D.C. Cir. 2003).  Earlier this year, Judge Urbina concluded that the Army still had not remedied the procedural defects, and therefore he granted an injunction against the conveyance of the Fort Ritchie property.  See Role Models Am., Inc. v. Brownlee (hereinafter "Role Models III"), No. 04-1595, slip op. at 2 (D.D.C. May 18, 2005).

The second RMA-filed action was brought on September 12, 2001 in the Circuit Court of

Maryland for Washington County and named as defendants PenMar and LaFleur. PenMar/LaFleur Mot. to Dismiss Ex. 1.  The complaint alleged breach of contract, fraud, negligent misrepresentation, breach of the covenant of good faith and fair dealing, and violation of Maryland corporate requirements, and it sought compensatory and punitive damages against PenMar and LaFleur totaling $20 million, as well as an injunction preventing PenMar from entering the buildings occupied by RMA and a declaration that PenMar was not a valid corporate entity under the laws of Maryland.  Id.  RMA subsequently withdrew the allegations of corporate-law violations, see Pls.' Opp. to PenMar/LaFleur Mot. to Dismiss at 8, and on January 28, 2002, the Circuit Court dismissed all but one of the remaining counts of RMA's complaint: the breach-of-contract claim.  PenMar/LaFleur Mot. to Dismiss Ex. 2.  Several months later (and four months after RMA's eviction), on November 15, 2002, the Circuit Court dismissed the case with prejudice and entered judgment for defendants "on the complaint and all claims and causes of action asserted therein."  PenMar/LaFleur Mot. to Dismiss Ex. 3.

The current matter came to this Court on January 28, 2004, when RMA filed a six-count complaint against Army Secretary R. Les Brownlee and Labor Secretary Elaine Chao (hereinafter collectively referred to as "Federal Defendants") and against PenMar and LaFleur (hereinafter collectively referred to as "Private Defendants").  All defendants subsequently moved to dismiss the case, and this Court received extensive briefing -- and held a hearing -- on those motions in 2004.  While the motions were under consideration, on March 4, 2005, RMA filed an Amended Complaint, as of right, under Rule 15(a) of the Federal Rules of Civil Procedure.  The Amended Complaint contained nine counts against the various defendants, but RMA later withdrew by

praecipe its demands for compensatory damages against the Federal Defendants.[1]  At present,

then, the following claims and demands for judgment are pending: (i) unjust taking by the Army

and PenMar, with an accompanying demand for an injunction that would direct the Army and

PenMar to convey 587 acres of the Fort Ritchie property to RMA at no cost; (ii) violation of 42

U.S.C. § 1981 by the Private Defendants, with a demand for compensatory damages of $25

million and punitive damages of $10 million; (iii) violation of 42 U.S.C. § 1985(3) by the Private

Defendants, with a demand for compensatory damages of $25 million and punitive damages of

---

[1] The praecipe arguably created some ambiguity about the extent to which it rendered inoperative Counts II and III of the Amended Complaint (alleging violations by the Federal Defendants of the plaintiffs' rights under the Fifth, Thirteenth, and Fourteenth Amendments of the U.S. Constitution).  Prior to the filing of the praecipe, each of those counts included a request for substantial money damages, a demand for attorney's fees and costs, and a catch-all prayer for "such other relief as the Court deems appropriate."  Because the praecipe purported to "withdraw[] ... claims for compensatory damages" against the Federal Defendants, it might be possible to construe the general request for "other relief" in Counts II and III as a demand for an injunction against the Secretaries of the Army and Labor or for some other form of prospective, non-compensatory redress.  See, e.g., Command Force Sec., Inc. v. City of Portsmouth, 968 F. Supp. 1069, 1072 (E.D. Va. 1997) (interpreting a "general request for 'any other relief' to include a request for an injunction").  The Court, however, cannot accept such a construction on these facts because the conduct complained of here is not ongoing, and thus is not amenable to a prospective remedy.  For this reason, the Court concludes that Counts II and III of the Amended Complaint were withdrawn in their entirety by the April 12, 2005, praecipe.

Even if the Court were willing to entertain the notion that Counts II and III are still viable, the Court is not persuaded by RMA's argument that the claims escape preclusion because they are based on facts that were unrelated to the earlier federal litigation.  Fairly read, these somewhat amorphous constitutional claims assert that the Army and the Department of Labor caused or contributed to RMA's injuries by failing to prevent PenMar from engaging in discriminatory conduct that was motivated by racial animus or bias.  In essence, this is simply another way of saying that federal officials failed to fulfill their legal obligations to RMA in overseeing the transfer of Fort Ritchie from government custody to private ownership.  Counts II and III, therefore, share a common nucleus of operative facts with the earlier claim that the Army committed procedural errors in its oversight of the property.  Furthermore, that prior litigation was ongoing for nearly four years, giving RMA plenty of time to raise any constitutionally based objections to the government's conduct along with its statutory claims.

$10 million; (iv) breach of contract and unjust enrichment against PenMar, with a demand for compensatory damages of $1.8 million; (v) fraud and fraudulent inducement against the Private Defendants, with a demand for compensatory damages of $10 million and punitive damages of $10 million; (vi) tortious interference with prospective advantage against the Private Defendants, with a demand for compensatory damages of $10 million and punitive damages of $10 million; and (vii) conversion against the Private Defendants, with a demand for compensatory damages of $1 million and punitive damages of $10 million.  On all counts, RMA also seeks recovery of attorney's fees and costs.  See Am. Compl. ¶¶ 108-150.

The Federal Defendants have moved to dismiss with prejudice the remaining claims against them, arguing that RMA fails to state a claim for which relief can be granted because, among other reasons, the doctrine of res judicata bars prosecution of the claim of unjust taking. Similarly, the Private Defendants have asserted that plaintiffs fail to state cognizable legal claims in light of res judicata.  The positions of all parties have been fully briefed and argued before this Court.

## **STANDARD OF REVIEW**

Because the affirmative defense of res judicata requires the Court in this case to consider materials extrinsic to the Amended Complaint -- specifically, the records of the prior proceedings -- the Court will treat defendants' motions to dismiss as motions for summary judgment.  See Fed. R. Civ. P. 12(b) ("If, on a motion asserting [plaintiff's] ... failure to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to

such a motion by Rule 56.").  Summary judgment is appropriate when the pleadings and the

evidence demonstrate that "there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Where the motion for

summary judgment is based on the doctrine of res judicata, the only facts that would be material

are the facts of what occurred in the prior court actions -- and where, as here, those earlier cases

involve written opinions, orders, or judgments, there is little room for a genuine factual dispute to

emerge.  Thus, absent some offering by the non-moving party that would call into question the

facial validity of court records from the prior proceedings, the Court will resolve the summary-

judgment motion by deciding whether the moving party is entitled to judgment as a matter of law

based on the undisputed facts of the prior proceedings.

## <u>ANALYSIS</u>

### I.      **Claims Against Federal Defendants**

As explained above, RMA withdrew by praecipe, dated April 12, 2005, all claims for

compensatory damages against the Federal Defendants.  By doing so, RMA limited its claims

against the Federal Defendants to a single claim of "unjust taking" by the Army, and as redress

for that alleged injury it asks for an injunction directing the Army to convey 587 acres of the Fort

Ritchie property to RMA at no cost.  Am. Compl. ¶¶ 108-112.[2]  Federal Defendants now request

---

[2] Although the Court finds it unnecessary to reach the merits of the claim, it notes that
RMA's request for a court-ordered conveyance of 587 acres of land based on an alleged "unjust
taking" appears to be founded on a dubious premise, namely that RMA possessed an entitlement
to the property beyond simply a procedural right to receive notice of an opportunity to apply for
the property and to have that application considered.  There is little support for defining as
substantive the rights that were "taken" from RMA with respect to the Fort Ritchie property -- as
an order to transfer the land to RMA would require -- especially since the D.C. Circuit in <u>Role
Models II</u> defined the "valuable right" to which RMA was entitled by law only as the right to
trigger a "public benefit conveyance screening" of its application.  <u>See</u> 317 F.3d at 333.

summary judgment on this claim, based on the principle of res judicata.

Res judicata, also known as claim preclusion, "is designed to conserve judicial resources, avoid inconsistent results, engender respect for judgments of predictable and certain effect, and to prevent serial forum-shopping and piecemeal litigation."  See Hardison v. Alexander, 655 F.2d 1281, 1288 (D.C. Cir. 1981).  The doctrine prohibits "the parties to a suit and their privies" from relitigating in a collateral proceeding "any ground for relief which they already have had an opportunity to litigate[,] even if they chose not to exploit that opportunity" and regardless of the soundness of the earlier judgment.  Id.

The preclusive effect of a prior judgment by a federal court is determined by the federal common law of res judicata, unless the rules of decision in the earlier case were supplied by state law.  See Heiser v. Woodruff, 327 U.S. 726, 733 (1946) ("It has been held in non-diversity cases since *Erie v. Tompkins*, that the federal courts will apply their own rule of res judicata.") (citations omitted); see also Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 324 n.12 (noting that "[i]n federal-question cases, the law [of preclusion to be] applied is federal law").  Under federal law, a claim is precluded as res judicata if all four of the following elements are present: "(1) an identity of parties in both suits; (2) a judgment rendered by a court of competent jurisdiction; (3) a final judgment on the merits; and (4) the same cause of action in both suits."  Polsby v. Thompson, 201 F. Supp. 2d 45, 48 (D.D.C. 2002).  Federal Defendants rely on the chain of federal-court decisions stemming from RMA's July 2001 complaint against the Army to support their affirmative defense of res judicata.

Neither Role Models I nor Role Models II, taken alone, can meet the third requirement for claim preclusion: a final judgment on the merits.  Role Models I was reversed on appeal, and

thus is not a final judgment on the merits for res judicata purposes.  See Ornellas v. Oakley, 618 F.2d 1351, 1356 (9th Cir. 1980) ("A reversed or dismissed judgment cannot serve as the basis for a disposition on the ground of res judicata or collateral estoppel.").  Role Models II, meanwhile, simply reversed Role Models I and remanded the matter to the district court.  It was, therefore, not a final judgment because, though its instructions to the district court were unequivocal, additional action was required to give effect to the decision.  See Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp., 527 F.2d 1162, 1163 (4th Cir. 1975) ("Since further proceedings will be necessary before either party can prevail on the merits ... there is no final judgment upon which [defendant] may found its res judicata defense.").

Role Models III, however, is a valid final judgment on the merits, within the meaning of the res judicata doctrine.  That decision imposed a permanent injunction on the Army's conveyance of the Fort Ritchie property,  see Role Models III, No. 04-1595, slip op. at 17 (D.D.C. May 18, 2005), which is "final" for purposes of res judicata.  See Falls Stamping & Welding Co. v. United Auto. Workers, 744 F.2d 521, 525 (6th Cir. 1984) (affirming district court's finding that a permanent injunction was a final order for preclusion purposes); see also 18A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 4432 (2d ed. 2005) ("Traditionally, finality was identified for purposes of preclusion in much the same way as it was identified for purposes of appeal.").  The fact that the final judgment was entered after the complaint was filed in this action is immaterial.  See Wright & Miller, supra, § 4404 ("Several federal cases recognize the general rule that as between actions pending at the same time, res judicata attaches to the first judgment regardless of the sequence in which the actions were commenced.").

A decision's status as a "final judgment" is, of course, not alone enough to trigger claim preclusion.  With respect to the additional requirements for Role Models III to qualify for res judicata effect in this case, there is no dispute as to whether the parties in that suit are identical or in privity with the Federal Defendants in the present case; nor is any question raised about the jurisdiction of the United States District Court for the District of Columbia to have rendered judgment in the earlier action.  Thus, the only remaining element to be addressed is whether the causes of action advanced in the two cases are the same.  "Same," in this context, means arising from a common "nucleus of facts."  See Page v. United States, 729 F.2d 818, 820 (D.C. Cir. 1984).  In other words, a cause of action, for res judicata purposes, is defined by "the facts surrounding the transaction or occurrence ..., not the legal theory upon which a litigant relies." Id.  This means that res judicata acts as a bar not only to the specific legal claims that were actually raised in the prior case, but also to any legal claims that "could have been raised" based on the same transaction or occurrence.  See Allen v. McCurry, 449 U.S. 90, 94 (1980).  In determining what constitutes a common nucleus of facts, federal courts look at whether the facts underlying the claims "are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."  See Apotex, Inc. v. FDA, 393 F.3d 210, 217 (D.C. Cir. 2004) (quoting I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co., 723 F.2d 944, 949 n.5 (D.C. Cir. 1983)).

Here, the unjust-taking claim against the Army arises from the same alleged wrongdoing that gave rise to the earlier suit, specifically the Army's failure to follow the correct procedures for transferring ownership of the Fort Ritchie property.  Indeed, the present claim that the Army

deprived RMA of a valuable statutory right not only arises from the same nucleus of facts as

Role Models III, it is, for all practical purposes, a clone of the earlier action.  The claims are so

closely related, in fact, that even the requests for relief are virtually identical.  Compare Am.

Compl. ¶112 ("[d]irect no-cost public conveyance to RMA of 587 acres of the Ft. Ritchie land")

with Role Models I, 193 F. Supp. 2d at 78 ("order the Army to directly convey the property to the

plaintiff as a public benefit conveyance").

In light of this analysis, RMA's claim of unjust taking by the Army is barred by res

judicata.  The Court, accordingly, will enter summary judgment for the Federal Defendants.

## II.     Claims Against Private Defendants

### A.      Federal-question claims

#### 1.      Civil rights actions: 42 U.S.C. §§ 1981 & 1985(3)

In its Amended Complaint, RMA alleges the Private Defendants violated federal civil

rights laws by "deliberately and intentionally" negotiating sublease agreements for the Fort

Ritchie property that were racially discriminatory.  Plaintiffs claim that another tenant --  the

International Masonry Institute ("IMI") --  received preferential treatment from PenMar and

LaFleur because it was a "Caucasian owned entity," and that RMA's lease was on less favorable

terms because Dr. Alexander, RMA's president and founder, is African-American.  Am. Compl.

¶¶ 125-130.  RMA contends that it was relegated to "blatant second class citizenship status" as a

result of the Private Defendants' racial bias.  Id. at ¶ 131.  Based on these assertions, plaintiffs

have charged the Private Defendants with committing racial discrimination in contracting, in

violation of 42 U.S.C. § 1981, and with participating in a racially motivated conspiracy --

involving LaFleur and other PenMar directors -- to deprive RMA of its civil rights, in

contravention of 42 U.S.C. § 1985(3).  The Private Defendants, while denying that there is any basis for the discrimination charges, respond that RMA should have raised these claims in its earlier suit against them in Maryland state court.  The failure to do so, they say, triggers the doctrine of res judicata and thereby bars this action.

In assessing whether a state-court judgment precludes a subsequent civil action in federal court, the federal court must apply the res judicata law of the state that rendered the earlier decision.  See Migra v. Warren City School Dist. Bd. of Educ., 465 U.S. 75, 81 (1984) ("a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered"); McLaughlin v. Alban, 775 F.2d 389, 391 (D.C. Cir. 1985) ("Any assessment of the preclusive effect the Maryland judgment might have here must apply the Maryland law of preclusion.").  Maryland has three requirements for the application of res judicata.  "First, there must have been a final judgment on the merits in the earlier litigation.  Second, there must be an identity of parties or their privies.  Third, the causes of action in the successive actions must be the same."  Snell v. Mayor & City Council of Havre de Grace, 837 F. 2d 173, 175 (4th Cir. 1988).  RMA does not dispute that there was a final judgment on the merits of at least one of the claims it brought against PenMar in September 2001, nor does it challenge that the parties are identical or in privity.  Thus, the res judicata determination in this case will turn on whether the causes of action in the successive cases were the same.

Since 1987, Maryland law -- much like federal law -- has used a "transaction test" to determine when two claims or causes of action are the same for purposes of res judicata.  See DeLeon v. Slear, 616 A. 2d 380, 390 (Md. 1992).  Under that test, "what factual grouping

-13-

constitutes a 'transaction' and what groupings constitute a series of connected 'transactions' are to be determined 'pragmatically, giving weight to such considerations as whether facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" Kent County Bd. of Educ. v. Billbrough, 525 A. 2d 232, 238 (Md. 1987). In this case, then, the question becomes whether the facts underlying the claims brought by RMA in the September 2001 suit -- a variety of contractual claims stemming from the lease agreement -- and the facts that form the basis of the current civil rights claims are so related in time, space, origin, or motivation that they form a single "transaction." The Court concludes that they are. All of the claims involve a single set of operative facts: the events and circumstances surrounding the lease agreement between RMA and PenMar, and, more specifically, the behavior of PenMar in its contractual dealings with RMA. Although RMA's Amended Complaint attempts to expand the material time frame beyond the formation of the lease agreement for purposes of the civil-rights claims -- suggesting that RMA's eviction was part of a continuing practice of racial discrimination -- the complaint contains no factual allegation that PenMar or LaFleur treated evictees differently on the basis of race; it only alleges disparate treatment in the lease terms PenMar negotiated with RMA, as compared with those that it negotiated with IMI.

As the Fourth Circuit said in Snell, "Maryland courts have emphasized ... that so long as the subject matter of the two suits is substantially the same, a plaintiff cannot avoid the bar of res judicata simply by changing the theory of recovery or seeking a different remedy ... [or] simply by adding new factual allegations." See 837 F. 2d at 176. The court concluded in Snell that a federal civil rights lawsuit (which included claims under §§ 1981 and 1983(5)) was precluded by

an earlier state-court action asserting claims of trespass, breach of contract, and defamation.  Id. at 174.  Much like the present case, the Snell suit arose out of a dispute over a lease agreement. The Fourth Circuit noted that, although the first action did not plead racial animus, "it is obvious that any racial animus that underlay the formal termination of Snell's lease necessarily also underlay any earlier conduct aimed at disrupting the lease."  Id. at 177.[3]

The conclusion that RMA's §§ 1981 and 1985(3) claims are transactionally coextensive with the earlier breach-of-contract claim, however, is not sufficient to end the inquiry because Maryland courts have recognized that a plaintiff can avoid the res judicata effect of a prior judgment that arose out the same transaction if there are new factual allegations "which could not, through the exercise of reasonable diligence, have been discovered in time to include them in the first suit."  Id. at 176.  Although many events transpired between and among RMA, PenMar, and LaFleur after the filing of the September 2001 suit (and even after its final resolution in the defendants' favor on November 15, 2002), none of those events undergird the §§ 1981 or 1985(3) claims.  Moreover, the only factual support that RMA offers for the allegation of intentional racial discrimination -- namely, the alleged disparity in terms between its lease and that of IMI -- was either known to RMA or reasonably discoverable at the time it brought the earlier state-court suit.  Indeed, the complaint in the September 2001 suit specifically alleges that plaintiffs were "denied equal access" to the Fort Ritchie property vis-à-vis IMI and clearly refers to IMI's lease terms.  PenMar/LaFleur Mot. to Dismiss Ex. 1 ¶ 22.  To be sure, RMA's specific allegation of

_____

[3] Notably, the court reached the conclusion that the state-court judgment was "broad enough in its potential reach to encompass the civil rights claims alleged in the second federal action," by applying a more restrictive test for determining whether the causes of action were the "same" for res judicata purposes because, at the time the lower court decided the case, Maryland had not yet clearly adopted the "transaction" test.  See Snell, 837 F. 2d at 177.

unequal treatment in the earlier complaint did not focus on race-based animus and was limited to a comparison of lease-renewal terms and purchase options.  But the prior complaint certainly demonstrates that RMA was on notice of the existence of IMI's lease agreement and the fact that there were differences between the terms of that lease and its own.

Furthermore, even if RMA were, as it asserts, unaware of the "more egregious disparate treatment" it received (specifically the "stark disparity in the rent PenMar charged RMA ... compared to IMI") until "much later and well after it filed its state case," see Pls.' Opp. to PenMar/LaFleur Mot. to Dismiss at 14, there is no doubt that it learned of those facts well before that case concluded.  Dr. Alexander testified in detail about the different rents paid by RMA and IMI at a hearing before a federal bankruptcy judge on July 11, 2002, see PenMar/LaFleur Mot. to Dismiss Ex. 10 at 23, a full four months before the Washington County Circuit Court dismissed RMA's September 2001 suit.  Upon discovering the variation in the rent terms, RMA could have sought to amend its complaint against PenMar in Circuit Court (a court of general jurisdiction[4]) to include -- along with its then-pending breach-of-contract claim -- the allegations of racial discrimination in contracting and of a racially motivated conspiracy that it now advances.  See Md. R. Civ. P. 2-341(a) (permitting a party to file an amendment to a pleading "at any time prior to 15 days of a scheduled trial date"); Tabor v. Baltimore City Pub. Schs., 773 A. 2d 628, 632

---

[4] See Md. Code, Cts. & Jud. Proc. § 1-501 (2005). Federal courts have long recognized that state courts are a proper venue for bringing federal civil rights claims, and, indeed, Congress was cognizant of concurrent state-court jurisdiction over federal questions when it enacted 42 U.S.C. § 1983.  See Allen v. McCurry, 449 U.S. 90, 99-100 (1980); see also id. at 96-97 (noting that § 1983 "and its legislative history clearly support" court decisions holding that "res judicata principles fully apply to civil rights suits brought under that statute"); id. at 104 ("There is ... no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court ....").

(Md. Ct. Spec. App. 2001) ("leave to amend 'should be generously granted'"); Prudential

Securities, Inc. v. E-Net, Inc., 780 A. 2d 359, 382 (Md. Ct. Spec. App. 2000) (amended

complaint should have been allowed in advance of trial where the amendment "merely contained

more factual detail than the original complaint" and the "operative factual pattern" remained the

same, "in light of the policy in this State of allowing liberal amendment of the pleadings").  RMA

chose not to amend its September 2001 complaint, and the Circuit Court later dismissed the case

with prejudice to "all claims and causes of action asserted therein."  See PenMar/LaFleur Mot. to

Dismiss Ex. 3.

      The availability of the amendment procedure in Maryland must inform this Court's view

of claim preclusion here because the justification for a far-reaching application of res judicata

principles carries more force in a jurisdiction that has permissive rules for amending pleadings.

See, e.g., Car Carriers, Inc. v. Ford Motor Co., 789 F.2d 589, 593-94 (7th Cir. 1986) (because the

Federal Rules of Civil Procedure give parties "great latitude in joining claims and amending

pleadings ... it is appropriate that res judicata be defined with sufficient breadth to encourage

parties to present all their related claims at one time").  Where litigants are permitted to amend

freely, courts cannot reasonably maintain a narrow definition of "cause of action" for res judicata

purposes, because doing so would leave defendants open to substantial uncertainty about their

exposure to additional claims -- both during the pendency of the action and after the case has

concluded.  Conversely, where the law restricts the circumstances in which amendment is

allowed, it would be untenable to define expansively the res judicata boundaries of a claim

because, in that setting, plaintiffs would be forced to bring any remotely conceivable claim at the

outset of litigation, regardless of merit, or risk losing the opportunity to assert it.  As a result, the

policies governing claim preclusion and amendments are complementary.  So, for example, just as Maryland's doctrine of res judicata broadly precludes subsequent claims that arise out of the same "transaction, or series of transactions," see DeLeon, 616 A. 2d at 390, the Maryland law governing relation back of amendments takes the liberal view that "no new cause of action is stated by a declaration framed on a new theory or invoking new legal principles" provided that "the operative factual situation remains essentially the same," see Crowe v. Houseworth, 325 A. 2d 592, 595 (Md. 1974).

Viewed together, then, these rules of decision strongly support the conclusion that a plaintiff in Maryland who proceeds to final judgment on the merits of a claim -- as RMA acknowledges it did with respect to the breach-of-contract claim in Washington County Circuit Court**,** see Pls.' Opp. to PenMar/LaFleur Mot. to Dismiss at 13 -- cannot later litigate a new claim against the same defendant (or its privy) where the facts supporting the subsequent claim arose from the same set of events as the prior action and were known to the plaintiff during the pendency of the prior action, unless leave to amend was sought and denied.  See also Car Carriers, 789 F.2d at 596 (rejecting as "absolutely without merit" plaintiff's contention that "res judicata should ... not bar claims based on prejudgment facts which were unknown to the plaintiffs when they filed").   Indeed, a contrary conclusion would render meaningless the statement by Maryland's highest court that a "losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on issues raised, *or that should have been raised*." Lizzi v. Washington Metro. Area Transit Auth., 862 A.2d 1017, 1022 (Md. 2004) (quoting Colandrea v. Wilde Lake Cmty. Ass'n, Inc., 761 A.2d 899, 909 (Md. 2000)) (emphasis added). Accordingly, the Court will grant summary judgment to the Private Defendants on the § 1981

and § 1985(3) claims.

### 2. Unjust taking

To the extent that RMA states a cognizable claim against PenMar for an "unjust taking" --
and the Court will assume as much for purposes of this motion[5] -- that claim also is barred by the
Maryland doctrine of res judicata.  The allegation that PenMar, in cooperation or conspiracy with
the Army, "deprived RMA of its statutory right to the public conveyance of the Ft. Ritchie
property by failing to adhere to procedural notice requirements to ... institutions ... like RMA, in
contravention of the DCBRA," certainly was available to RMA at the time it filed the September
2001 complaint in Maryland Circuit Court.  Indeed, RMA made that very allegation against the
Army several weeks *earlier*, in its July 2001 complaint filed in this Court.[6]  Moreover, the
allegation arises out of the same set of transactions and events that spawned the state-court action
against PenMar -- that is, the alleged tortious conduct of PenMar toward RMA (e.g., fraud,
negligent misrepresentation, and breach of the covenants of good faith and fair dealing).  The
"unjust taking" claim does not assert any conduct by PenMar that was unknown or inchoate at the
time of the earlier action; it merely alleges that the very same course of conduct it alleged in the
earlier suit had an additional effect: the loss of its procedural rights under the DCBRA.  Simply
invoking "different grounds for recovery based on the same evidence" will not permit a plaintiff
to overcome the bar of res judicata.  Kutzik v Young, 730 F.2d 149, 152 (4th Cir. 1984)

---

[5] The Court, however, reiterates its observation about the questionable nature of the
premise upon which this claim depends.  See n.2 above.

[6] Although it is not essential to the res judicata analysis, the Court notes that if PenMar
was, as RMA alleges, part of a conspiracy or cooperative effort with the Army to deprive RMA
of its procedural rights under the DCBRA, PenMar might have been a necessary party to
litigation before Judge Urbina under Rule 19(a) of the Federal Rules of Civil Procedure.

(applying Maryland claim preclusion law to federal constitutional claims).  In short, Maryland's law of claim preclusion requires that summary judgment be granted to the Private Defendants on the unjust-taking claim.

**B.      State-law claims**

RMA's Amended Complaint also contains four counts against the Private Defendants founded on Maryland law: (1) breach of contract and unjust enrichment, (2) fraud and fraudulent inducement, (3) tortious interference with prospective advantage, and (4) conversion.  Federal courts have jurisdiction over state-law claims only when the claims either satisfy the requirements for diversity jurisdiction under 28 U.S.C. § 1332 (which no party suggests are met here), or (2) are closely "related" to federal-question claims,[7] within the meaning of the supplemental jurisdiction statute, 28 U.S.C. § 1367.  The latter statute requires that the closeness of the relationship between the federal claims and the state claims be such that they "form part of the same case or controversy under Article III of the United States Constitution."  See 28 U.S.C. § 1367(a).   Courts consider claims to be part of the same Article III case or controversy if they "derive from a common nucleus of operative fact."  See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).  RMA asserts that its state-law claims satisfy this requirement.  Am. Compl. ¶ 1 ("The Court has ... supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367(a).").

As a threshold matter, the Court agrees with RMA that most of its state-law claims are related enough to its federal claims against the Private Defendants to support jurisdiction under 28 U.S.C. § 1367, sometimes referred to as "ancillary" or "pendent" jurisdiction.  The same core

---

[7] The federal-question jurisdiction of District Courts is governed by 28 U.S.C. § 1331.

of operative facts that supports the federal civil rights claims -- the contractual dealings between

PenMar and RMA -- also forms the basis of the "breach of contract and unjust enrichment" count

(which alleges that PenMar wrongfully retained RMA's rent payments after failing to provide

suitable premises under the lease, see Am. Compl. ¶¶ 135-37 ) as well as the "fraud/fraudulent

inducement" count (which asserts that PenMar and LaFleur, in negotiating the lease with RMA,

misrepresented their intentions to make certain repairs to the Fort Ritchie property and to make

available to RMA the "entire amount of the leased space," see Am. Compl. ¶¶ 139-42).  RMA's

reliance on this Court's supplemental jurisdiction, however, tends to undercut its contention that

those claims are not precluded by the earlier Washington County Circuit Court judgment.  To the

extent that these two state-law claims share a common nucleus of facts with the federal claims

sufficient to support supplemental jurisdiction, they also necessarily arise from the same

"transaction" as the earlier state-court action for purposes of Maryland's res judicata doctrine.

Because RMA does not deny that the supportive facts for these transactionally related claims

were in existence and known (or at least readily discoverable) at the time the earlier suit was

ongoing, the claims must, therefore, be precluded.

Be that as it may, this Court need not rely on a doctrinal two-step to establish that res

judicata bars the present breach of contract and fraud claims, for the two counts are nearly

identical -- in substance, if not language -- to Count One ("Breach of Contract") and Count Two

("Fraud") of RMA's September 2001 state complaint.  Compare Am. Compl. ¶¶ 134-42 with

PenMar/LaFleur Mot. to Dismiss Ex. 1 at ¶¶ 50-65.  That suit, as already noted, resulted in a

final judgment on the merits, and thus RMA is barred from relitigating those claims here.[8] Persistance in the face of adversity can, in some instances, be an admirable personal quality, but the doctrine of res judicata makes it an unacceptable approach to litigation where the adverse circumstances are final judgments rendered by courts of competent jurisdiction.  The Court, therefore, will enter summary judgment for the Private Defendants on those two counts.

As for the remaining two state-law claims -- tortious interference and conversion -- the Court will assume for purposes of this decision that these claims also are sufficiently related to the civil rights claims to support supplemental jurisdiction in federal court.  Moreover, the Court will grant that RMA may be able to overcome the bar of res judicata on these two claims because it is at least plausible that RMA was unable to discover some of the relevant facts in time to have raised them in Washington County Circuit Court prior to that court's final judgment in November 2002.[9]  Putting that aside, however, the exercise of supplemental jurisdiction remains discretionary on the part of a federal court.  This Court may decline to exercise supplemental jurisdiction if the related state-law claims "substantially predominate[]" over the federal-question claim(s) or if all federal-question claims have been dismissed or otherwise resolved.  See 28 U.S.C. § 1367(c).  Having disposed of all the federal-question claims in this case (as well as two of the four state-law claims) on res judicata grounds, and being left with only two potentially valid claims -- both rooted in Maryland common law -- this Court now must decide whether to

---

[8] Again, it must be noted, RMA advances no argument that it was not aware of (or could not have learned of) the underlying facts at the time of the earlier litigation.

[9] Those facts include the extent of the alleged property loss sustained during RMA's July 2002 eviction and defendants' alleged communications with congressional and executive-branch officials, which RMA contends prevented it from securing additional funding.

exercise its discretionary jurisdiction over the claims of tortious interference and conversion.

The Court has concluded -- based on considerations of policy, efficiency, and the relative

expertise of state courts on matters of state law -- that dismissal of the remaining claims is

warranted.

In deciding to exercise its discretion to decline jurisdiction over these state-law claims,

the Court takes account of the fact that, even though the parties have expended substantial time

and effort litigating the dispositive motions, this case has not yet proceeded to discovery.  In

other words, the investment of resources has not been so great as to render unfair a dismissal for

want of supplemental jurisdiction at this stage of the proceedings.  Furthermore, the Court

believes it prudent for federal judges to refrain from deciding cases founded solely on state law

when the litigants do not satisfy the prerequisites for diversity jurisdiction that Congress has

established -- absent a compelling countervailing justification.  The Court's decision also is

influenced by the well-established policy of federal courts to discourage forum shopping by

plaintiffs.  There is evidence before this Court supporting an inference that RMA has employed a

forum-shopping strategy.  For example, Dr. Alexander, in his testimony at the July 11, 2002,

bankruptcy proceeding, said that he "came to the Bankruptcy Court seeking justice which I

couldn't find at the lower court level," apparently referring to the Maryland state courts.

PenMar/LaFleur Mot. to Dismiss Ex. 10 at 51.  "The politics of [Washington] County are so

incredible. ... We never got justice and so I wanted to find a level playing field and I believe we

can find it here in this Court."  Id.  No matter how much plaintiffs may feel slighted by their

home-state courts, they cannot get state-law claims into federal court via the back door of

supplemental jurisdiction under these circumstances.

Accordingly, the remaining state-law claims against the Private Defendants will be dismissed, without prejudice, as no longer pendent to any continuing federal claim.

## **<u>CONCLUSION</u>**

For the foregoing reasons and based on the entire record, the Court will grant summary judgment in favor of defendants on the federal-question claims and the state-law claims of breach of contract and fraud, and it will dismiss, without prejudice, the remaining state-law claims against the Private Defendants for want of supplemental jurisdiction.  A separate order has been issued on this date.


                          /s/ John D. Bates
                        JOHN D. BATES
                   United States District Judge


        Dated:   October 5, 2005


Copies to:

Donald M. Temple
TEMPLE LAW OFFICES
1229 15th Street, NW
Washington, DC  20005
Email: TemplePC@aol.com

Jared Kenric Ellison
TEMPLE LAW OFFICES
1200 G Street, NW, Suite 370
Washington, DC  20005
Email: jaredellison@aol.com

   *Counsel for plaintiffs*

Kevin K. Robitaille
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC  20001
Email: kevin.robitaille2@usdoj.gov

Uldric L. Fiore, Jr.
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC  20001
Email: uldric.fiore@usdoj.gov

Lawrence P. Fletcher-Hill
GORDON, FEINBLATT, ROTHMAN, HOFFBERGER & HOLLANDER, LLC
233 East Redwood Street
Baltimore, MD  21202
Email: lfletcherhill@gfrlaw.com

Timothy F. McCormack
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
300 East Lombard Street, 18th Floor
Baltimore, MD  21202
Email: mccormackt@ballardspahr.com

*Counsel for defendants*